HENRY CHOUTEAU, PLAINTIFF IN ERROR, *v.* PATRICK MOLONY.

On the 22d of September, 1788, the tribe of Indians called the Foxes, situated on the west bank of the Mississipi, sold to Julien Dubuque a permit to work at the mine as long as he should please; and also sold and abandoned to him all the coast and the contents of the mine discovered by the wife of Peosta, so that no white man or Indian should make any pretension to it without the consent of Dubuque.

On the 22d of October, 1796, Dubuque presented a petition to the Baron de Carondelet for a grant of the land, which he alleged that he had bought from the Fox Indians, who had subsequently assented to the erection of certain monuments for the purpose of designating the boundaries of the land.

The governor referred the petition to Andrew Todd, an Indian trader, who had received a license for the monopoly of the Indian trade, who reported that as to the land nothing occurred to him why the governor should not grant it, if he deemed it advisable to do so, provided Dubuque should be prohibited from trading with the Indians, unless with Todd's consent, in writing.

Upon this report the governor made an order, granted as asked, under the restrictions expressed in the information given by the merchant, Andrew Todd.

This grant was not a complete title, making the land private property, and therefore excepting it from what was conveyed to the United States by the treaty of Paris of April 30, 1803.

The words of the grant from the Indians do not show any intention to sell more than a mining privilege; and even if the words were ambiguous, there are no extrinsic circumstances in the case to justify the belief that they intended to sell the land.

The governor, in his subsequent grant, intended only to confirm such rights as Dubuque had previously received from the Indians. The usual mode of granting land was not pursued. Dubuque obtained no order for a survey from Carondelet, nor could he have obtained one from his successor, Gayoso.

By the laws of Spain, the Indians had a right of occupancy; but they could not part with this right except in the mode pointed out by Spanish laws, and these laws and usages did not sanction such a grant as this from Carondelet to Dubuque.

Moreover, the grant included a large Indian village, which it is unreasonable to suppose that the Indians intended to sell.

This case was brought up by writ of error, from the District Court of the United States for the District of Iowa.

It was an action brought by petition, in the nature of an ejectment, by Chouteau, a citizen of Missouri, to recover seven undivided eighteenth parts of a large body of land, containing nearly one hundred and fifty thousand arpents; and including the whole city of Dubuque. Molony claimed under a patent from the United States. The documents upon which Chouteau's claim was founded are set forth *in extenso* in the opinion of the court; and as that opinion refers to Mr. Gallatin's report, it may be proper to give a history of the claim so that his report may be introduced. A large portion of the argument, in behalf of the plaintiff in error, consisted of reasons to show that Mr. Gallatin was mistaken. The following is the history of the case, as given by Mr. Cormick.

*History of the Claim.* In a case so free from doubt, the question arises, why did Congress assume that Dubuque's title was worthless, and sell the land?

The answer to this question is, Mr. Gallatin, while Secretary of the Treasury, became prejudiced against the land titles of Upper Louisiana, and so much prejudiced against this particular title, that he construed it with reference, not to the grant itself, but to his preëxisting prejudices; that he made a report adverse to the claim, and utterly misdescribed the document upon which that claim is based; that congressmen, when the question came up before them, referred, as was natural, to Mr. Gallatin's report, to see what it said about the title, and finding it there described as the grant of a mere personal permission of occupancy, revocable at will, they naturally concluded it was a fraudulent effort to obtain property, which the claimants knew they had no right to.

On the 3d of November, 1804, a treaty was made by General William Henry Harrison, Governor of the Indiana Territory, (of which the present States of Missouri and Iowa were then a part,) with the Sac and Fox Indians. An additional article was inserted to prevent the land granted to Dubuque from being considered as receded by the treaty. The Indians then acknowledged the validity of the grant. See p. 22 of Senate Doc. 350 of 1st Sess. 28th Cong.

On the 17th of May, 1805, Julien Dubuque and Auguste Chouteau, as his assignee of a portion of the land, jointly filed their claim.

On the 20th of September, 1806, a majority of the Board of Commissioners, John B. C. Lucas, dissenting, pronounced the claim to be a complete Spanish grant, made and completed prior to the first day of October, 1800.

In 3 Green's Public Lands, 588, will be found the translation of the title, which seems to have been the translation relied on by the Board, as well as by Mr. Gallatin. It is in the following words, namely:

(These documents are inserted, in the opinion of court, with some change of phraseology. There was much controversy, during the argument, as to the proper translation.)

On the 11th of April, 1810, the United States agent laid before the Board of Commissioners, in pursuance of section 6 of act of 2d March, 1805, (2 Statutes at Large, 328,) a list of documents, which list embraces this claim, pertaining to lead mines and salt springs in the Territory of Louisiana. 3 Green's P. L. 603.

In 1810, Mr. Gallatin, instead of reporting to Congress the action of the board relative to the claim, himself made an *ex parte* official report against it. 1 Clark's Land Laws, 958.

On the 19th of December, 1811, the following entry was made on the minutes of the Board of Commissioners, namely:

" December 19th, 1811. Present, a full board. On a ques-

tion being put by John B. C. Lucas, commissioner, Clement B. Penrose and Frederick Bates, commissioners, declined giving an opinion. It is the opinion of John B. C. Lucas, commissioner, that the claim ought not to be confirmed." 2 Green's P. L. 552.

The claimants were not parties to this last proceeding. It seems to have originated between the dissenting commissioner and the Secretary of the Treasury, who were under the impression that the sixth section of act of 2d March, 1805, which required the government agent " to examine into and investigate the titles and claims, if any there be, to the lead mines within the said district, to collect all the evidence within his power, with respect to the claims and value of the said mines, and to lay the same before the commissioners, who shall make a special report thereof, with their opinions thereon, to the Secretary of the Treasury, to be by him laid before Congress," &c., thereby authorized the Board, by an *ex parte* proceeding, to reverse their own decision made more than five years before.

Dubuque continued in possession of the land till his death, in 1810. During his life, he had exercised great influence over the neighboring Indians. But that influence had been much enhanced by the liberal presents he had made them. He died insolvent. That portion of the tract which he had not sold to Auguste Chouteau, was sold after his death, by order of court, to pay his debts. In the meanwhile the last war with England was approaching; and English emissaries were on the frontiers, inciting the savages to hostilities against our people. Our government was not then, as it now is, sufficiently strong to protect the frontiers.

In the latter part of 1832, the claimants thought the time had come when they might safely attempt the enjoyment of their rights, as the assignees of Dubuque, to the profits which might be realized from the lead mineral contained in the land. They accordingly employed an agent to lease to miners the right to dig on the land for lead. On the 5th of January, 1833, the following order was issued by the Major-General of the United States army :

(This was an order to remove the settlers by force.) See p. 28, Sen. Doc. 350, 1st Sess. 28th Cong.

In pursuance of this order, a military detachment was sent from Fort Crawford, and the claimants' tenants were driven off at the point of the bayonet, and their dwellings burnt.

The claimants at that time all lived in the State of Missouri, mostly at St. Louis. One of them, on his own behalf, and as agent for the others, went to Galena, in Illinois, to institute legal proceedings. He could not sue for the land, because after

Missouri had come into the Union, as a State, there was no court which had jurisdiction of a suit brought for the recovery of the land. The federal government had in the meanwhile leased much of the land to lead diggers, and a considerable portion of the mineral dug on the land was taken to smelting furnaces at Galena, to be converted into lead. But much of the mineral then smelted at Galena was from land not embraced in this grant. The agent for the claimants, in order to test the question of title, brought suit for a lot of mineral, which had been brought to Galena. But he was not at the trial able to identify it, and a nonsuit was taken. The agent then came to Washington, and petitioned for redress during many successive sessions of Congress. Certain citizens of Kentucky had in the meanwhile, by intermarriage and by inheritance, become interested in the claim, and on their own account presented a memorial in January, 1837. Several memorials were also presented to the executive. Various bills were reported for the relief of the claimants, some of which passed in one house, and were never reached in the other, and others were voted down in the house in which they originated.

An act of Congress was passed the 2d of July, 1836, for the laying off the towns of Fort Madison and Burlington, in the county of Des Moines, and the towns of Belleview, Dubuque, and Peru, in the county of Dubuque, Territory of Wisconsin, and for other purposes. The towns of Dubuque and Peru, the lots of which were required by this act to be sold, are situated on the land embraced by the grant on which this suit is based. What is now the State of Iowa, constituted, on the 2d of July, 1836, a part of the Territory of Wisconsin.

On the 3d of March, 1837, an act, amendatory of the foregoing, was passed. The manner in which the town lots are to be sold is somewhat varied from the manner specified in act of 2d of July, 1836, 5 Stat. at Large, 178, 179.

(Then followed an enumeration of the reports of committees in each branch of Congress, and the acts passed, under one of which Malony claimed title.)

Mr. Gallatin's report was a succinct statement of the facts in the case, upon which he made the following remarks:

I. Governor Harrison's treaty adds no sanction to the claim; it is only a saving clause in favor of a claim, without deciding on its merits, a question which indeed he had no authority to decide.

II. The form of the concession, if it shall be so called, is not that of a patent, or final grant; and that it was not considered as such, the commissioners knew, as they had previously received a list procured from the records at New Orleans, and

transmitted by the Secretary of the Treasury, of all the patents issued under the French and Spanish governments, in which this was not included, and which also showed the distinction between concession and patent, or complete title.

III. The form of the concession is not even that used when it was intended ultimately to grant the land; for it is then uniformly accompanied with an order to the proper officer to survey the land, on which survey being returned the patent issues.

IV. The governor only grants as is asked; and nothing is asked but the peaceful possession of a tract of land on which the Indians had given a personal permission to work the lead mines as long as he should remain.

Upon the whole, this appears to have been a mere permission to work certain distant mines without any alienation of, or intention to alienate the domain. Such permission might be revoked at will; and how it came to be considered as transferring the fee-simple, or even as an incipient and incomplete title to the fee-simple, cannot be understood.

It seems, also, that the commissioners ought not to have given to any person certificates of their proceeding, tending to give a color of title to claimants. They were by law directed to transmit to the treasury a transcript of their decisions, in order that the same might be laid before Congress for approbation or rejection.

On the trial of the cause in the District Court, the plaintiff admitted that the defendant was a purchaser under the government of the United States, and that patents had been regularly issued to him for the land in question.

The defendant demurred, and specified the three following causes of demurrer, namely:

1. That, admitting all the facts stated in the petition to be true, the plaintiff is not entitled to recover.

2. That, as appears by the exhibits to said petition, the plaintiff claims under an unconfirmed Spanish title.

3. That it appears, from the plaintiff's own showing, that he rests his title on an incomplete Spanish grant, and that defendant is in possession under a complete title from the United States.

A judgment final was rendered by the court below, in favor of the defendant on this demurrer. The assignments of error were

1. The said District Court erred in deciding that the said petition of the said Henry Chouteau, and the matters therein contained, were not sufficient in law to maintain the said action of the said Henry Chouteau.

2. The said District Court erred in rendering judgment in favor of the said Patrick Molony against the said Henry Chouteau.

Upon these points of demurrer the case came up to this court, and was argued by *Mr. Cornick* and *Mr. Johnson*, for the plaintiff in error, and by *Mr. Platt Smith*, *Mr. T. S. Wilson*, and *Mr. Cushing*, (Attorney-General,) for the defendant in error.

The points which were made on behalf of the plaintiff in error are thus stated by *Mr. Cornick.*

The record presents but one question, namely: Was the grant which the Baron de Carondelet made to Julien Dubuque on the 10th of November, 1796, a complete title?

If it constituted a complete title, the judgment of the court below is erroneous; if it did not constitute a complete title, there is no error in the record.

The decisions of this court which established the doctrine that a grant of land of specific locality, by the Spanish land-granting officer, vested in the grantee a complete title, are so numerous and so uniform that it would be considered unnecessary to cite authorities to sustain this grant, but for the fact that the United States government has, by selling the land, assumed it to be a part of the public domain. For this reason many authorities will be cited in support of propositions of law, which would otherwise be regarded as self-evident. And an explanation will be submitted of the causes which probably induced Congress to disregard a grant, the validity of which is wholly free from doubt the moment it is viewed from the proper point of view.

I. The Baron de Carondelet had power to make the grant. That interest which the Governor-General intended to grant, whether fee-simple or a tenancy at will, whether limited or unlimited in the duration of the estate, was the interest which, by virtue of the grant, vested in Dubuque. See United States *v.* Arredondo, 6 Pet. 691; Percheman *v.* United States, 7 Pet. 51; Delassus *v.* United States, 9 Pet. 134.

In the United States *v.* Moore, 12 How. 217, this court recognized Carondelet's power as extending from January 1, 1792, to the beginning of 1797. It was within this period that this grant was made.

In Delassus *v.* United States, 9 Pet. 117, the court say: " The regulations of Governor O'Reilly were intended for the general government of subordinate officers, and not to control and limit the power of the person from whose will they emanated. The Baron de Carondelet must be supposed to have had all the powers which had been vested in Don O'Reilly." In Smith

Chouteau *v.* Molony.

*v.* United States, 4 Pet. 511, the same principle is established. See the printed record.

In United States *v.* Arredondo, 6 Pet. 728, it is said that the actual exercise of the power of granting land, by a colonial governor, without any evidence of disavowal, revocation, or denial by the king, and his consequent acquiescence and presumed ratification are sufficient proof — in the absence of any to the contrary — (subsequent to the grant) of the royal assent to the exercise of his prerogative by his local governors.

According to the principle here established, the King of Spain must be considered as having acquiesced in, and assented to the grant by the Baron de Carondelet to Dubuque, unless his dissent be proved by the defendant.

In United States *v.* Arredondo, 6 Pet. 729, the court say: " It is an universal principle, that when power or jurisdiction is delegated to any public officer or tribunal, over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter; and individual rights will not be disturbed collaterally for any thing done in the exercise of that discretion, within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done, and the public or any one denying its validity, are power in the officer and fraud in the party. All other questions are settled by the decision made, or the act done by the tribunal or officer, whether executive, legislative, judicial, or special, unless an appeal is provided for, or other revision, by some appellate or supervisory tribunal, is prescribed by law."

This court, in Strother *v.* Lucas, 12 Pet. 410, say: " Where the act of an officer, to pass the title to land, according to Spanish law, is done contrary to the written order of the king produced at the trial, without any explanation, it shall be presumed that the power has not been exceeded; that the act was done on the motive set out therein, and according to some order known to the king and his officers, though not to his subjects; and courts ought to require very full proof that he had transcended his powers, before they so determine it."

II. The description of the land by Dubuque, in his petition, completely fixed its locality, and dispensed with the necessity of a survey.

(The argument upon this point is omitted.)

III. The assent of the Baron de Carondelet to the petition establishes the truth of its statements, and the moment he assented, the sale by the Indians, to Dubuque, thereby ceased to be a link in the chain of title.

18 *

IV. Our government cannot grant or sell land which does not belong to it.

But the principal part of the argument of the counsel for the plaintiff in error was directed to show that Mr. Gallatin had erred in the report which he made and the four conclusions to which he came, which have been already stated in this report. These errors were said to be the following:

*Mr. Gallatin's first error.* The language near the close of the report — " Upon the whole, this appears to have been a mere permission to work certain distant mines, without any alienation of, or intention to alienate the domain. Such permission might be revoked at will; and how it came to be considered as transferring the fee-simple, or even as an incipient and incomplete title. to the fee-simple, cannot be understood."

Following what the secretary had already said about Todd's report — (" The governor refers the application for information to A. Todd, who had the monopoly of the Indian trade on the Mississippi. A. Todd reports that no objection occurs to him, if the governor thinks it convenient to grant the application, provided that Dubuque shall not trade with the Indians without his permission,") — necessarily impressed congressmen, who relied on Mr. Gallatin's report for their views of the grant, with the belief, not only that the claim set up by Dubuque and Chouteau, before the commissioners, was a fraudulent pretence to what they knew they had no right to, but also that A. Todd recommended the granting to Dubuque of a mere personal permission of occupancy. Mr. Gallatin professes to describe the grant; yet no one from his description could even suspect that Todd had in his report used the language — "As to the land for which he asks, nothing occurs to me why it should not be granted, if you deem it advisable to do so; with the condition nevertheless that the grantee shall," &c.

Here we find a most material variance between the grant itself and Mr. Gallatin's description of it. Congress did really cause the land, covered by the grant, to be sold; but we here see very clearly that Congress passed no judgment against the validity of the title on which this suit is based, but that it only decided against the title which Mr. Gallatin's violently excited prejudices fancied to exist. If a man had been indicted for the larceny of this document, and it was as much misdescribed in the bill of indictment as it is in this report of Mr. Gallatin, surely no court would hesitate to decide, on objection properly made, that the grant to Dubuque, represented by any one of the translations ever made of it, could not be given in evidence in support of the indictment.

*Mr. Gallatin's second error.* In the first sentence of his re-

port he speaks of the claim as containing upwards of one hundred and forty thousand acres of land.

Whatever may have been Mr. Gallatin's opinion of his knowledge of the law of Spanish grants, it is now very certain that neither he, nor any other American citizen, understood the subject at that time. But we must suppose that so able a Secretary of the Treasury understood arithmetic. Yet he so exaggerated the amount embraced by this claim as to demonstrate, that if he knew how to calculate quantities, he was so prejudiced against the claim that he was unable, in this particular case, to make such calculation. Even if the distance from the little Makoketa to the Mesquabysnenque, which Dubuque states to be about seven leagues along the bank, were a straight line, so as to give a front of exactly seven leagues, so as to make the claim embrace exactly twenty-one leagues of superficies, there would only be one hundred and twenty-five thousand and sixty acres. But as in fact the river bank curves there, as it does everywhere else, and curves very much — and as what Dubuque calls about seven leagues along the bank, is really less than seven, though upwards of six — the real quantity embraced by the claim is a little over ninety-seven thousand acres. Mr. Gallatin committed an error of about forty-seven thousand acres, in fact. But, when he made his report, he did not have the data by which accurately to calculate the number of acres. Yet he then had data enough to show that he was exaggerating, at least to the extent of fourteen thousand nine hundred and sixty acres.

*Mr. Gallatin's third error.* He contradicts himself in describing the sale by the Indians to Dubuque. In the commencement of his report, he describes it as a purchase "from the Indians, of an extent of seven leagues front on the Mississippi, by three leagues in depth, containing upwards of one hundred and forty thousand acres." He afterwards speaks of it as a sale of the " hill and contents of the land (or mine) found by Peosta's wife." He afterwards speaks of the right acquired by Dubuque as a " personal permission to work the lead mines as long as he should remain."

*Mr. Gallatin's fourth error.* Remark No. 2 of the report involves the proposition, that concession and patent are two things entirely distinct. And, at the same time, he uses such language as shows he considered that patent and final grant were synonymous, and that a grant was not final unless it was evidenced by a patent.

(The argument upon this head, and also that under the head of the eighth error, are omitted for want of room, as they were both very elaborate.)

*Mr. Gallatin's fifth error.* In his remark No. 3, he considers a survey an essential prerequisite to a complete grant. But we have seen that many decisions of this court have established that a description which fixes the boundaries, dispenses with the necessity of a survey.

He seems to have had a confused idea that this grant to Dubuque was vicious, because it was not made in accordance with the regulations of O'Reilly, Gayoso, or Morales. But a very slight examination of those regulations would have shown him the impossibility of surveying the land in the manner there required; as in the wilderness country where Dubuque made his settlement, there was no neighbor, no syndic, no officer of any description. He would then have seen that to make an actual survey, a prerequisite would amount to denying the power to the Baron de Carondelet to grant the land.

*Mr. Gallatin's sixth error.* In remark No. 3, he advances the proposition that, after the grant of an inchoate title, the execution of the order of survey was the only prerequisite to the issuance of a patent. He advances this as a universal proposition. But in the great majority of cases this is untrue. Observe, for example, the order of the governor-general in the inchoate grant to Owen Sullivant. This error of the secretary is material; for it shows he was extremely ignorant of the laws he usurped the power to pass judgment on.

*Mr. Gallatin's seventh error.* He adopted as a fundamental principle of Spanish law, to guide his decision, the erroneous hypothesis that all grants, whether in the wild Indian country or not, must completely correspond with the forms usually observed when the land granted was situated in the settled parts of the province, and that the governor-general had no power to grant by any other form.

*Mr. Gallatin's eighth error.* In remark No. 4, he considers peaceable possession as synonymous with personal permission of occupancy, revocable at will.

We have seen that the four translations of the grant heretofore made, differed, in some respects materially, one from another. The translation averred in the record, differs from the preceding four. Those four all agree in rendering the word "possession" into the English word "possession," and three of them render "paisible" into "peaceable," while the remaining one renders it into "peaceful." The main difference between those four translations and the translation averred in the record is, that the latter represents the words "*paysibles possessiont*" by English words, which indicate ownership enjoyed free from adverse claim.

This new version was made for the following reasons: The

French phrase, "*paisible possession*," is an idiomatic expression, and it would, as used in this petition, raise directly in the mind of a Frenchman the idea of ownership and quiet enjoyment free from adverse claim, without any reasoning whatever on the subject. It was attempted, in shaping this new translation, not only to raise in the mind of the reader the same ideas which were raised in the mind of the Baron de Carondelet, when he read the original, but to raise them in the same direct manner.

The most usual signification of the French word "*possession*" is enjoyment of a thing in the character of its owner. In the same way "*possesseur*" most usually signifies a person enjoying a thing as its owner. In the French language "*le posses-seur*" is the person who has *la possession;* just as in English "possessor" is the person who has the possession.

On the part of the defendant in error, the points were thus stated by *Mr. Wilson*, which were sustained also by *Mr. Smith*.

The land in controversy is in what was called the Louisiana territory acquired by the treaty of 1803.

The United States extinguished the Indian title to it by the treaty of 1832, made by General Scott and Governor Reynolds. See Indian Treaties, 7 Stat. at Large, 374.

The sale by the United States, to the defendant, was under the act of Congress, 9 Stat. at Large, 37.

The plaintiff admits that defendant holds the land by patent from the United States.

This is the defendant's title.

It is manifest from the plaintiff's petition and exhibits that he has no title, and

1st. From the permit from the Indians. They did not and could not sell the land, and they did not profess to do so. It was but a permit to mine.

2dly. From the permit or license from Carondelet. This permit or license is improperly translated in plaintiff's petition. The words "*paysibles possessions*" and "*paysibles possessures*" in the original, which should be translated "peaceable posses-sion," are rendered in the plaintiff's petition "full proprietor-ship."

The petition of Dubuque is again improperly translated in the plaintiff's petition, namely, what should be rendered "from the coast above the little river Maquoquetais to the coast of the Mesquibenanques," has been rendered "from the margin of the waters of the Maquotais," &c.

The permit from Carondelet was a mere license to work the mines, and was not intended by him as any thing more. See the permit and also the construction put upon it by Albert Gal-

latin, in his report on this claim in Senate Document No. 20, vol. 2, 28th Cong. 2d Sess.

The United States government took possession of this land immediately after the Rock Island Treaty. See the letter of General Macomb in the same document, p. 28.

That the permit from Carondelet was a mere license to work the mines, is evident from the fact that the petition of Dubuque is in the precise words required by the ordinances of Spain in reference to petitions for working the mines. See Rockwell on Mines, p. 173, §§ 2, 4. " No mines shall be worked without permission from the crown." If it had been intended as a grant, the *proces verbal* and order of survey would have been issued.

3dly. Carondelet had no legal authority to make such a grant, or to divest the crown of the title in this summary manner, because —

(a.) It was in violation of the regulations of O'Reilly. See the 1st, 2d, 3d, and 12th articles, in 2 White's Compilation, 228, *et seq.*

(b.) There was no compliance with the regulations of Morales. See those regulations, 2 White's Compilation, 472, 477, 235.

4thly. If Carondelet even had the power to make a grant of this land, and if the paper is more than a license, it was only an inchoate and imperfect title, and not such a title as will avail any thing in a court of law. This is manifest from the numerous decisions of this court on the subject of Spanish claims. In these decisions four great principles or landmarks are well settled, namely :

First. That there must be a compliance with the ordinances and regulations of Spain, to sever the land from the public domain. 2 Howard, 372.

Antoine Soulard was, at the time, and both before and after, Surveyor-General of Upper Louisiana. See Amer. St. Papers, vol. 5, p. 700. Why was no order of survey issued to him ?

Second. In order to constitute a valid claim, there must be clear words of grant. United States v. Perchman, 7 Peters, 81; New Orleans v. The United States, 10 Peters, 727; United States v. Arredondo, 6 Peters, 691; United States v. King, 3 Howard, 773. There are no words of grant in this case, and no compliance with the usual and necessary forms.

Third. There must be a definite description of the land granted. United States v. Boisdoré, 11 Howard, 92; Choteau v. Eckhard, 2 Howart, 372. The description in this case is indefinite and uncertain.

Conclusion. If it should be decided that the papers exhibited by the plaintiff exhibit a full and perfect title, without any act

of Congress confirming this grant, or authorizing another tribunal to confirm it, it would be a reversal of all principles established by the previous decisions of this court on this subject.

*Mr. Cushing*, (Attorney-General,) after referring to the action of the executive and legislative departments of the government upon this subject, laid down the two following propositions, namely:

I. That the political power of the government, to which this court conforms its judgment in such matters, has decided against the validity of the pretended title in Dubuque.

II. That the decision of the political power of the government was a rightful one, as well on the true tenor of the alleged grant, as upon the collateral facts set forth in the printed record.

(The discussion under the first head and also the arguments under many subdivisions of the second head, must be omitted for want of room.)

II. The action of the executive and legislative departments of the government, in refusing to recognize this claim, and in disposing of the land as public domain, was right; because the documents produced by the plaintiff do not show a perfect and complete title, nor a full property and ownership in Julien Dubuque.

1. The cession by the Indians, the petition to the Baron de Carondelet, and the Baron's concession thereupon, must all be taken together as one instrument, because they are all connected by reference in the writings themselves; and so they serve to explain each other. United States v. King, 7 Howard, 833.

The cession by the Foxes to Dubuque appears on the face of the instrument to be a mere personal permission to occupy and work at the mine discovered by the woman Peosta, "and in case he shall find nothing within he shall be free to search wherever it shall seem good to him." That which is sold is the contents of the mine found by the woman Peosta, with the privilege of searching elsewhere.

There is no quantity, no boundary, no estate of inheritance, no location of land except the mine found. It is impossible to make of this any conveyance of land. It is a personal privilege to work the mine found, and if that should prove unproductive, to search at pleasure for another mine.

Independently of the question as to what is the nature of the Indian document, it could of course, according to the general rules established by all European governments in America, not convey any title of itself. United States v. Clarke, 9 Peters 168.

2. The petition to Carondelet alludes to the Indian cession and Dubuque's working of the mines, and asks only to be confirmed in the peaceable possession of that which he was in possession of under the permission of the Foxes, which is appended to the petition. No quality or duration of estate other than that contained in the Indian permission, is asked for. Sensible of this, the petitioner in this case has endeavored to eke out the petition by interpolation, and to supply defects by parol testimony, as before remarked.

3. In Carondelet's indorsement of the petition there is no order of survey, none of the usual words of a patent or complete title, no reference to the authority of the king, no grant in his royal name. It is unlike the complete titles usually granted. United States v. King, 7 Howard, 852.

To a complete title, to a full property in fee under the Spanish law, a survey, a formal investiture of possession by the proper officer, and a title thereupon in form, were indispensable. Until then the title was but incipient, inchoate, equitable only, not full and complete.

An example of a complete Spanish grant is given in the case of Menard's Heirs v. Massey, 8 Howard, 293, 314.

The difference between an incomplete, and a full comple title is well known. To the former a survey is not a prerequisite; a description reasonable to a common intent, which may be thereafter perfected by a survey, is sufficient. To the latter a survey and a formal title thereupon, duly made and duly recorded, are indispensable. O'Hara v. United States, 15 Peters, 282, 283; United States v. Forbes, 15 Peters, 173, 185; Buyck v. United States, 15 Peters, 215; United States v. Miranda, 16 Peters, 159, 160; United States v. Powers' Heirs, 11 Howard, 577; Heirs of Vilemont v. United States, 13 Howard, 266; 2 White's Recopilacion, 238, art. 15, 16.

The question here is not whether Dubuque acquired an incipient property, an equitable title, which might have been perfected into a complete title, by a survey and title in form thereupon, but whether the instrument, produced by the plaintiff, is of itself such a complete Spanish grant of a perfect title as severed an identical tract from the public domain, and conveyed it to Dubuque, so that nothing passed to the United States.

Such a complete conveyance, such a perfect title, the plaintiff has alleged, and must prove; such only can sustain his action: an incipient interest, a mere equity will not do.

To divest the sovereign of his public domain and convey it to a subject, certainty, identity, precise locality is essential. If something yet remains to be done, if a survey be yet necessary to ascertain and fix the identity of the land, the severance is not

complete, the conveyance is not perfect, the prince is not denuded of his domain, the subject is not completely invested with a private right; the prince yet holds, and the subject must look to the prince to do, by his officers, the farther acts to complete the severance, and perfect the inchoate private right into a complete title.

As in our own system land titles are progressive from an incipient, inchoate right, to a perfect title by patent, as when the purchaser at public sale has paid the price and obtained the certificate thereof of the receiver and register, or when the preemptioner has proved his settlement, cultivation, building, and habitation, paid the price, and received the certificate of the register and receiver, he is yet invested only with an inchoate title, and must obtain thereon an affirmance of his right and a patent in due form from the General Land Office, — so also under the Spanish dominion of Louisiana, land titles were progressive from an incipient, inchoate right, from a petition admitted or conceded, an order of survey to fix the identity of the tract of land, the formal delivery of possession thereof, the return of the procès verbal and figurative plat, up to the approval thereof by the governor, or the intendent-general, and the issue of the title in form thereupon:

Upon Dubuque's petition to Carondelet there was no order of survey, no survey, no severance of a precise quantity by defined limits from the public domain. Being only a permission to work the mines which he had opened, and not intended as a grant of the land in fee, the preliminary steps necessary to obtain such a title were not ordered nor taken.

The king, the government, the prince, cannot be disseized. Therefore a formal delivery of possession by a competent officer was required by the law of Spain.

Until a subject has acquired a legal private right to the land, his occupancy is not a disseisin of the prince; the occupant is tenant at will, his occupancy is not adverse but in subordination to the public title of the prince.

7. But the words "granted as asked" (*concedido come se solicita*) are relied upon.

The name of an instrument does not change the body and effect of the writing, no more than the title of a statute can change the purview and body of the enactment. See United States v. King, 7 Howard, 833.

The word "granted," is not of itself sufficient to make a complete title an ownership in fee. It may include a mere privilege to work the mines, or a tenancy at will, or an estate for a term of years, or for life, or an estate in fee, just as the words with which it is connected will authorize according to the

requirements of law. "Granted," or "grant," has no such technical meaning and effect as to convey an absolute complete title in fee. It may apply to a personal favor, a mere privilege, to any thing which is solicited.

The verbal argument, so much elaborated by plaintiff's counsel, has no force.

The petition prays of Carondelet "*accorder.*" This French word is not a word of title. It means to grant, to allow, to accord, to give, to concede, as "*accorder une grâce,*" "*accorder sa fille en mariage.*" Fleming and Tibbits, *sub voc.*

The indorsement of Carondelet is, "*concedido;*" but "*concedido*" has no force as a word of title. It is to give, grant, bestow, a loan or gift, or to grant or admit a proposition. Salvá, Dic. Castel. *sub voc.*

Even in English the word "granted," has not of itself any intrinsic efficiency to make a complete title, an ownership in fee. It may include a mere privilege to work the mines; or a tenancy at will, or an estate for a term of years, or for life, or an estate in fee, just as the words with which it is connected will authorize, according to the requirements of law. "Granted" or "grant," has no such technical or all sufficient meaning and effect as to convey an absolute, complete title in fee. It may apply to a personal favor, a mere privilege, to any thing which is solicited.

In the seventh section of the act of the 3d of March, 1807, (2 Stat. at Large, by Little & B. 441,) we have the words — "That the tracts of land thus granted by the commissioners." Here "granted" is applied to the certificates of the commissioners. But such granting by the commissioners did not invest the party to whom such a grant was made with a complete title, but the land was to be surveyed and a patent would issue thereupon in due form from the General Land Office.

So when Carondelet indorsed the petition of Dubuque, even if it had contained the interpolated words — "and to grant him the full proprietorship thereof," the petition and indorsement, "granted as asked," would have amounted to no more than an incipient, imperfect right, which could have been perfected only by a survey officially made and returned, and a title in form issued thereon in the name of the king.

8. The great question in the case is, whether the document, on which the plaintiff relies, is a complete legal title on which an action of ejectment can be sustained. This is a question, first of Spanish law, and secondly of that of the United States.

O'Reilly, under whom the Spanish power in Louisiana, after the cession by France to her was secured and established, made regulations respecting the grant of lands by virtue of the powers

given to him by the king.    These regulations are dated at New
Orleans, the 18th of February, 1770.

The 12th article states " that all grants shall be made in the
name of the king by the governor-general of the province."
2 White, 230.

By a communication of the Marquis de Grimaldi to Unzaga,
the successor of O'Reilly, of the 24th of August, 1770, (2 White,
460,) in which he states that O'Reilly had recommended that
the governor alone should be authorized by his Majesty to make
grants, and that orders should be given in conformity with the
instructions drawn up and printed in the distribution of the
royal lands, he says: " The king having examined these dispo-
sitions and propositions of the said lieutenant-general, approves
them, and also that it should be you and your successors in that
government only who are to have the right to distribute (re-
partir) the royal lands, conforming in all points as long as his
Majesty does not otherwise dispose, to the said instruction, the
date of which is February 18th, of this present year." · This,
be it observed, is the date of O'Reilly's regulations.

The formula observed by the Spanish governors, in making
complete grants, always stated that they were made in the name
of the king, and in virtue of the authority vested in them by the
king.

The regulations of O'Reilly were, it is to be observed, to be
the land law of Louisiana until the king should otherwise dis-
pose.    The laws of the Indies had nothing to do with the sub-
ject.

The Council of the Indies approved of the regulations of
O'Reilly.  2 White, 463–4.   Unzaga succeeded O'Reilly; Gal-
vez succeeded him, 1779;  Miro succeeded him, 1786;  Caronde-
let, him, 1791;  Gayoso, him, 1796, who made new regulations
in 1797.   2 White, 231.

It was during Gayoso's administration that the granting of
lands was taken away from the governor and vested in the in-
tendant, at the instigation of Morales, who became vested with
power, and issued his regulations in 1799.

The regulations of O'Reilly, approved as they were by the
king, were the regulations in force at the time of the alleged
grant by Carondelet to Dubuque.

The regulations of Hita, made long afterwards, and in Florida,
have nothing to with the case.

But the court has already decided that an order or instrument,
like that in the present case, " granted," &c., is an incomplete
title, and not a perfect grant.

The act of 1824, with respect to land-titles in Missouri, it will
be remembered, applies, and gives the court jurisdiction only in
the cases of incomplete titles.

Under this act a petition was filed by John Smith, T., claiming a tract of land under a petition to Carondelet, at the bottom of which were these words: "New Orleans, 10 February, 1796, Granted. The Baron de Carondelet."

The court acted on this as an incomplete title and confirmed it. Smith v. United States, 10 Pet. 328.

So it was held in the case of the Florida Land Cases. By the act of 1828, (4 Stat. at Large, 285) these claims were to be adjudicated according to the forms, rules, regulations, conditions, restrictions, and limitations prescribed to the district judge, for claimants in the State of Missouri, by the act of 26th May, 1824. The Florida courts had, therefore, only jurisdiction in the cases of incomplete titles. In the case of the United States v. Wiggins, the alleged grant by Governor Estrado, was, — "The tract which the interested party solicits, is granted to her, without prejudice to a third party, &c." The court took jurisdiction of this as an incomplete grant, but dismissed the petition on the merits. 14 Pet. 345.

These cases show that the word "Granted" does not make a complete title, and is not used exclusively in relation to complete titles to land.

The title is complete or incomplete according to the body of the writings, whether the word "Granted" be or be not used.

The document relied upon by the plaintiff bears no resemblance to a Spanish complete title, made in pursuance of the regulations of O'Reilly, approved and ordained by the king as irrevocable, except by his own order. See the letter of the Marquis of Grimaldi to Unzaga, of 24th August, 1770; 2 White's Recopilacion, p. 460.

It was only a permit to Dubuque to work the mines, that he might avoid a violation of the law of Spain, which ordained that no mine shall be worked without permission from the crown. Rockwell on Spanish Mines, p. 170, 173, c. 5.

Being but a concession to Julien Dubuque to work the mines, it was revocable at will, and died with him if not previously revoked.

Had Carondelet intended to grant a title in fee to such a body of land and the mines, he would not have neglected his duty so far as not even to have preserved the evidence thereof in the public archives. Neither would Dubuque have neglected the matter so important to the security of such an estate. But viewing the instrument as a personal permit to work the mines, the conduct of Carondelet and Dubuque is consistent with the law.

Mr. Justice WAYNE delivered the opinion of the court.

It is necessary to make a statement of the facts of the case

from the pleadings, in order that the opinion which we shall give may be fully understood.

It is a suit for the recovery of land, but not according to the form of the proceedings in ejectment. It is a petition according to the course of pleading allowed in the courts of Iowa, (which has been adopted by the District Court of the United States,) setting forth in detail the facts upon which the petitioner claims the ownership of the land.

The petitioner, Henry Chouteau, states that he is the owner of several tracts of land, and that they are wrongfully withheld from him by the defendant, Patrick Molony. It is admitted that Molony purchased the lands from the United States, and that he has a patent for them. But the validity of the patent is denied, upon the ground that the land had been granted to Julien Dubuque by the authorities of Spain, before Louisiana had been transferred by France to the United States.

Dubuque's claim is said, by the petitioner, to be a purchase from the Fox Indians of a large tract of land situated in what is now the Dubuque Land District.

It is described as bordering on the Mississippi River, extending from the Little Makoketa River to the mouth of the Musquabinenque Creek, now called Tete des Morts. The purchase, it is said, was made at Prairie du Chien, from the chiefs of the Fox Indians, on the 22d September, 1788. In proof of it, an instrument in writing, in French, is produced, with a translation into English.

It is further stated that Dubuque paid the Indians for the land in goods when the writing was executed. The petitioner then states, that the chiefs of the Fox Indians, a few days afterwards, assented to the erection of monuments, and that they were erected at the mouths of the rivers just mentioned, as evidence of the upper and lower boundaries of the tract of land.

It is also said that Dubuque occupied the land from the time it was sold to him; that he made improvements on it, cleared an extensive farm, constructed upon it houses and a horse-mill; that he cultivated the farm and dug lead ore from the land, which he smelted in a furnace constructed for that purpose. This land was in the Spanish province of Louisiana; Dubuque resided on this land from 1788 to his death in 1810. Upon his first settlement there, he employed ten white men as laborers, who removed from Prairie du Chien to enter his service; that the white inhabitants who resided on the land were almost entirely persons who had been inhabitants of Prairie du Chien before Dubuque made his settlement, and that other persons from that town entered into his service in the interval between the date of his contract with the Indians and the time when he ap-

19 *

plied to the Governor of Louisiana, the Baron de Carondelet, for the confirmation of the sale of the Indians to him. It also appears that Dubuque, from the time he made his settlement until the province of Louisiana was transferred to the United States, did not permit any one to carry on busi ess on the land without having first obtained his consent, and that he drove forcibly from it a person named Guêrien, who came there with goods to trade.

It seems, too, that Dubuque was a man of enterprise; that, during his residence upon this land, he exercised great influence over the Indians on both sides of the Mississippi River; and that the Winnebagoes on the east of it, and the Foxes on the west of it, were in the habit of consulting with him upon their more important concerns.

It will be remembered that Dubuque's settlement on the land began with the date of his bargain with the Fox Indians, which was the 22d of September, 1788. Eight years afterwards, or to be precise, on the 22d of October, 1796, Dubuque presented to the Baron de Carondelet, at the city of New Orleans, his petition for a grant to him of the land which he alleges he bought from the Fox Indians, by his contract with them of the 22d of September, 1788, and their subsequent assent to the erection of the monuments upon the Makoketa and Tête des Morts, as designations of the boundary of the land on the Mississippi River. The governor referred his petition to Andrew Todd, an Indian trader, who had received a license for the monopoly of that trade, for Todd to give to him information of the nature of Dubuque's demand. Todd replied, that he had acted upon the reference of the memorial, saying, that as to the land for which he asked, nothing occurred to him why it should not be granted, if you deem it advisable to do so; with the condition, neverthless, that Dubuque should observe his Majesty's provisions relating to the trade with the Indians, and that he should be absolutely prohibited from doing so unless he shall have Todd's consent in writing.

Upon this answer of Todd, Governor Carondelet makes this order: Granted as asked, under the restrictions expressed in the information given by the merchant, Andrew Todd.

The contract with the Indians, Dubuque's petition to the governor, the reference of it to Todd, Todd's return of it with his written opinion, and the governor's final order, are here annexed.

The exhibit referred to in the petition, and filed therewith, and marked A, is in the words and figures following, to wit:

*Exhibit A.* — *Conveyance from Foxes to Dubuque.*

Copie de conseil tenu par Messrs. les Renards, c'est à dire, le

chef et le brave de cinque villages avec l'approbation du reste de leur gens, expliqué par Mr. Quinantotaye, deputé par eux, en leur presence et en la notre, nous soussignés, sçavior, que les Renards permette à Julien Dubuc, appelé par eux la petite nuit, de travailler à la mine jusqu'à qui lui plaira, des s'en retirer sans lui specifier aucun terme ; de plus, qu'il lui vende et abandonne toute la côté et contenu de la mine trouve par le femme Peosta, que sans qu'aucuns blancs ni sauvages, ni puissent pretendre sans le consentment du Sr. Julien Dubuc ; et si en cas ne trouve rien dedans, il sera mêtre de cherche où bon lui semblera, et de travailler tranquillement, sans qu'aux qu'un ne puisse le nuire, ni portez aucune prejudice dans ses travaux ; ainsi nous, chef et brave, par la voie de tous nos villages, nous sommes convenu avec Julien Dubuque, lui vendant et livrant de ce jour d'hui comme il est mentionneé ci-dessus, en presence de Françcois qui nous attende, qui sont les temoins de cette pièce, à la Prairie du Chien, en plein conseil le 22 7br., 1788.

BLONDEAU,<br>
ALA <sub>sa</sub> x AUSTIN,<br>
marque.<br>
AUTAQUE.

BAZIL <sub>sa</sub> x TEREN, temoin,
marque.

BLONDEAU <sub>marque</sub> x DE QUIRNEAU,
tobague.

JOSEPH FONTIGNY, temoin.

The exhibit referred to in the petition, and filed therewith, and marked B, is in the words and figures following, to wit:

### *Exhibit B. — A Translation of A.*

Copy of the council held by the Foxes, that is to say, of the branch of five villages, with the approbation of the rest of their people, explained by Mr. Quinantotaye, deputed by them in their presence, and in the presence of us, the undersigned, that is to say, the Foxes, permit Mr. Julien Dubuque, called by them the Little Cloud, to work at the mine as long as he shall please, and to withdraw from it, without specifying any term to him ; moreover, that they sell and abandon to him all the coàst and the contents of the mine discóvered by the wife of Peosta, so that no white man or Indian shall make any pretension to it without the consent of Mr. Julien Dubuque ; and in case he shall find nothing within, he shall be free to search wherever he may think proper to do so, and to work peaceably without any one hurting him, or doing him any prejudice in his labors.

Thus we, chief and braves, by the voice of all our villages, have agreed with Julien Dubuque, selling and delivering to him this day, as above mentioned, in presence of the Frenchmen who attend us, who are witnesses to this writing.

At the Prairie due Chien, in full council, the 22d of September, 1788.            BLONDEAU,
                                 ALA AUSTIN, his x mark,
                                 AUTAQUE.

BAZIL TEREN, his x mark,  ⎫
        marque              ⎪
BLONDEAU DE x QUIRNEAU,   ⎬ Witnesses.
        tobague.            ⎪
JOSEPH FONTIGNY.          ⎭

The exhibit referred to in the petition, and filed therewith, and marked H H., is in the words and figures following, to wit:

*Exhibit H H.—Petition of Dubuc to Carondelet, &c.*

A son excellence le BARON DE CARONDELAIS:

Le tres humble suplyent de votres excellence, nommé Julien Dubuque, aiant faites une abbitation sur les frontier de votres gouvernemens, au millieux des peuples sauvages, qu'il sont les âbiteurs du pays a achetée une partye de terre de ces indients avect les mines qu'il quontient, et par sa parsaverances a surmonter tous les optacles tous contenzes que densgerenzes est parvenue approi bien des travences à être paysibles possesseures d'unes partye de terre sur la rives occidentalle du Mississypi, à quil il a donnee le nom des mines d'Espagnes, en mêmoir du gouvernemens aqui il appartenais. Comme le lieux de l'abitation n'est qu'un point, et les diferentes mines qu'il travailles sont et parts et à plus de trois lieux de distences les unes des autres, le très humbles supplyant prit votres excellences de vouilloir bient lui accorder la paysibles possessions des mines et des terres, qui ai à dire, depuis les cautes d'eau aux de la petites rivier Maquanquitois jusque au quantes de Mesquabysnanques, ce qu'il formes environt sept lieux sur la rives occidentalle du Mississippye, sur trois lieux de profondeure, que le très humbles supliant *anzes* esperer que vos bontée vousdrats bien lui accorder sa demandes et prit settes même bonti qu'il fait le bonneur de tous de sugaits, de me pardonner mon stille, et de vousloir bient aprouver la pure smplicitée de mon cœur au defaux de mon elloquences. Je prie de ciel de tous mon pouvoir possibles qu'il vous conserves et qu'il vous combless de tous ses bientfait; et je sui et serez toutes ma vie, de votres excellences le très humbles et très auxbeissents, et très soumis servitteur.

                                 J. DUBUQUE.

*Order to Todd.*

NUEVA ORLEANS, 22 *de October de* 1796.

Informe el comerciante Dn. Andres Todd, sobre la naturaleza de.esta demanda.    EL BARON DE CARONDELET.

*Information of Todd.*

S'OR GOB'OR: Compliendo con el superior decreto de V. S. en que me manda informar sobre la solicitud del individuo interesado en el antecendente memorial, debo decir, que en quanto á la tierra que pide, nada se me ofrece, en que V. S. se la conceda, si lo halla por conveniente, con la condicion sin embargo de observara el concesionario lo prevenido por S. M. acerca de la treta con los Indios, y que esta se le prohibira absolutamente á menos que notenga mi consentimiento por escrito.

Na. Orleans, 29 de Octubre de 1796.    ANDREW TODD.

*Order of Carondelet to Dubuc.*

NUEVA ORLEANS, *de Noviembre de* 1796.

Concedido como se solicita baxo las restricciones que el comerciante Dn. Andres Todd expresa en su informe.
    EL BARON DE CARONDELET.

*Certificate that H H is a true copy of the original paper withdrawn by plaintiff, by leave of court.*

The foregoing two pages have been prepared by me in pursuance of an order of court to that effect, and is a true copy of Dubuque's petition, the interlocutory orders of the Baron de Carondelet and Andrew Todd, and the final order of the Baron de Carondelet.

Witness my hand, this 9th January, 1852.
    T. S. PARVIN, *Clerk.*

The exhibit referred to in the petition, and filed therewith, and marked C, is in the figures and words following, to wit:

*Translation of H H.*

To his excellency, the BARON DE CARONDELET:

Your excellency's very humble petitioner, named Julien Dubuque, having made a settlement on the frontiers of your government, in the midst of the Indian nations, who are the inhabitants of the country, has bought a tract of land from these Indians, with the mines it contains, and by his perseverance has surmounted all the obstacles, as expensive as they were dangerous, and, after many voyages, has come to be the peaceable possessor of a tract of land on the western bank of the Mississippi, to which [tract] he has given the name of the

" Mines of Spain," in memory of the government to which he belonged. As the place of settlement is but a point, and the different mines which he works are apart, and at a distance of more than three leagues from each other, the very humble petitioner prays your Excellency to have the goodness to assure him the quiet enjoyment of the mines and lands, that is to say, from the margin of the waters of the little river Maquanquitois to the margin of the Mesquabysnonques, which forms about seven leagues on the west bank of the Mississippi, by three leagues in depth, and to grant him the full proprietorship * thereof, which the very humble petitioner ventures to hope that your goodness will be pleased to grant him his request. I beseech that same goodness which makes the happiness of so many subjects, to pardon me my style, and be pleased to accept the pure simplicity of my heart in default of my eloquence. I pray Heaven, with all my power, that it preserve you, and that it load you with all its benefits ; and I am, and shall be all my life, your Excellency's very humble, and very obedient, and very submissive servant.

J. DUBUQUE.

New Orleans, *October*, 22, 1796.

Let information be given by the merchant, Don Andrew Todd, on the nature of this demand.

THE BARON DE CARONDELET.

Senor Governor: In compliance with your superior order, in which you command me to give information on the solicitation of the individual interested in the foregoing memorial, I have to say that, as to the land for which he asks, nothing occurs to me why it should not be granted, if you deem it advisable to do so ; with the condition, nevertheless, that the grantee shall observe the provisions of his Majesty relating to the trade with the Indians; and that this be absolutely prohibited to him, unless he shall have my consent in writing.

New Orleans, October 29, 1796.     ANDREW TODD.

New Orleans, *November* 10, 1796.

Granted as asked, under the restrictions expressed in the information given by the merchant, Don Andrew Todd.

THE BARON DE CARONDELET.

The defendant in this suit demurred, and for causes of demurrer says :

1. Admitting all the facts of the petition to be true, the plaintiff is not entitled to recover.

---

\* " Peaceable possession " is the proper translation of the original.

2. As it appears by the exhibits to the petition that the plaintiff claims under an unconfirmed Spanish title, he has no standing in a court of law.

3. That it appears, from the plaintiff's own showing, that he rests his title upon an incomplete Spanish grant, and that the defendant is in possession under a complete title from the United States:

It appears, then, that the petitioner claims under the Indian instrument of writing, termed by him a sale, and in virtue of a confirmation of it into a grant by the Governor of Louisiana, the Baron de Carondelet, dated the 10th November, 1796. We shall consider the case, as it was argued by all of the counsel, as presenting but one question.

Was the grant which the Baron de Carondelet made to Julien Dubuque, a complete title, making the land private property, and therefore excepted from what was conveyed to the United States by the Treaty of Paris of the 30th April, 1803?

Our inquiry begins with the examination of that paper introduced by the petitioner as the Indian contract of sale to Dubuque.

After reciting that the paper is a copy of the council held by the Foxes and the braves of the five villages, with the approbation of the rest of their people, these words are found in that paper: " The Foxes permit Mr. Julien Dubuque, called by them the Little Cloud, to work at the mine as long as he shall please, and to withdraw from it without specifying any time to him; moreover, that they sell and abandon to him all of the coast or hills and contents of the mine discovered by the wife of Peosta, so that no white man or Indian shall make any pretension to it without the consent of Mr. Julien Dubuque; and in case he shall find nothing within, he shall be free to search wherever he may think proper to do so, and to work peaceably, without any one hurting him or doing him any prejudice in his labors."
From these terms it is plain that Dubuque was treating with the Indian council for a mine, the mine of Peosta, with all the coast or hill, and the contents of that mine, with the privilege to open other mines, protected in doing so from all interferences in the event that he should not find ore in the Peosta mine. The words, that they sell and abandon to him all the coast and the contents of the mine discovered by the wife of Peosta, are the only words from which it can be implied that they were selling land. Admitting that they do so, the words " all the coast" of the mine Peosta cannot be enlarged to mean more than the land which covered its ramifications and the land contiguous to them, which was necessary for the operations of the miners and for their support. We say so because such were

the allowances under the mining ordinances of Spain. We shall see hereafter how that was determined by the Spanish ordinances regulating the mines. But to make it more certain that the Indians meant to sell a mine, and that Dubuque was bargaining for a mine, the contract of sale conveying it to him, with the extended privilege to open other mines if that bought should turn out to be deficient in ore, the council conclude their paper thus: "We, the chiefs and braves, by the voice of all of our villages, have agreed with Julien Dubuque, selling and delivering to him this day, as above mentioned, in the presence of the Frenchmen who attend us, who are witnesses of this writing." There are no words in this paper, except the words "all the coast" of the mine of Peosta, conveying any other land, either as to locality, quantity, or boundary. When it is remembered, too, that this paper or contract was written by Frenchmen, and that one of them explained to the Indians what it meant or what the paper contained, and that it was witnessed by other Frenchmen, some of whom could read and write, it is hard for us to suppose that they meant by it to convey to Dubuque the large tract of land which he afterwards claimed, or that they did not honestly, fairly, and fully write only that which the Indians meant to do. At all events, if the words of the paper are doubtful as to what the Indians meant to sell, as the copy of the council is written in a language which they could neither read nor fully understand, it will be but right to hold it as an uncertainty, and not to permit their bargainee, Dubuque, or his alienees, to give it a fixed meaning in their own favor.

But let it be admitted that the words of the copy of this Indian council are obscure and ambiguous, so as to express its meaning imperfectly, and that a resort may be made to exterior circumstances connected with the transaction to ascertain its intention. There are no such proofs in the case — nothing of the kind to guide us to a different conclusion than that which the paper expresses. Dubuque, the interested party, is made to say, in the plaintiff's petition, that a few days after the Indian sale was executed, the chief, in the presence of Dubuque, assented to the erection of monuments at the mouth of the Little Makoketa, and at the mouth of the Tâte des Morts, as evidence that the former was the upper and the latter the lower end of the Mississippi River boundary line of the large tract, and that the monuments were actually erected. With the exception of the erected monuments, the same is repeated in Dubuque's memorial to Governor Carondelet for a grant; but with this remarkable addition for the first time, that the tract from the points mentioned on the river was to a depth of three leagues. This depth is not in the copy of the Indian council. It was not

stipulated for by Dubuque, nor in any way mentioned by or to the chiefs when they assented to the erection of monuments. It will be seen at once that it was necessary for him to give depth to the tract when he applied to the governor for a grant, in order to give certainty to his previous declaration that he had bought the land from the Indians. Without having a given depth, the tract could not have been surveyed as to quantity or boundaries. On that account it would, under the Spanish law, as well as our own, have been void for its uncertainty. Indeed, we cannot think otherwise than that the statement in the petition in this case is contradictory to Dubuque's petition for a grant of the land, and that the first must be taken as the fullest extent, of any arrangement between Dubuque and the Indians subsequently to their sale to him of the Peosta mine, with a privilege to search elsewhere if that mine should fail. The erection of monuments within certain distances upon the river was consistent with the privilege to search for other mines. In the absence of all words from which it can be inferred that a sale of land was meant, the monuments, as points mentioned on the river, can have no other reference than to the privilege to search for mines. This, in our view, is the sound interpretation of the Indian contract, and the statement made of it in the petition in this suit.

It would certainly be a novelty, even in the looseness with which grants of land were made in Louisiana, if a grantee or one claiming under him was permitted by his own declaration to amend and enlarge a specification defective in the particulars of quantity and boundaries.

Our interpretation of the paper, given by the Fox Indians to Dubuque, will be much strengthened, if it needs it, by a brief statement of what were the rights of the Indians in those lands and to the mines.

Spain, at all times, or from a very early date, acknowledged the Indians' right of occupancy in these lands, but at no time were they permitted to sell them without the consent of the king. That was given either directly under the king's sign-manual, or by confirmation of the governors representing him. As to the mines, whether they were on public or private lands, and whether they were of the precious or baser ores, they formed a part of what was termed the royal patrimony. They were regulated and worked by ordinances from the king. These ordinances were very many, differing, and contradictory. It is very difficult, though aided by the best commentaries upon them, to determine in all instances how far the older ordinances were repealed by those subsequently made, or how much of both of them remained in force. As to the rights of the crown, however,

there can be no uncertainty. By the law of the Partida, law 5, title 15, Partida 2, Rockwell, 126, the property of the mines was so vested in the king that they were held not to pass in a grant of the land, although not excepted out of the grant; and though included in it, the grant was valid as to them only during the life of the king who made it, and required confirmation by his successors.

The law 11, title 28, Partida 3:

" The returns from the port, salt-works, fisheries, and iron-works, and from the other metals, belong to the emperors and kings, and all these things were granted to them that they might have wherewith an honorable establishment to defend their lands and kingdoms, and to carry on war against the enemies of the faith, and that they might have no need to load their people with great or grievous burdens." Rockwell, 126. Rockwell also says, by the law 8, title 1, book 6, of the Ordenamiento Real, (we have not seen the original,) copied in law 2, title 13, book 6, Collection of Castile, that all mines of gold, silver, or any other metal whatsoever, and the produce of the same, were declared to be the property of the crown, and no one was to presume to work them except under some especial license or grant previously obtained, or unless authorized by immemorial prescription. This rule was afterwards moderated by law 1, title 13, book 6, Collection of Castile, so far as to permit any person to dig or work mines in his own land or inheritance, or with the permission of the proprietor in that of any other individual; the miner retaining for himself, after deducting expenses, one third of the produce, rendering the other two thirds to the king. Rockwell, 126. Subsequently the profitless return of the mines in the Spanish dominions induced Philip 2d, acting with the council and chief accountants of the mines, to reserve all grants which had been made of them, whether they were in private or in public ground. The object of this proceeding was to throw open to all of his subjects the right to search for mines both in public and private grounds, giving to the owner of the latter a compensation for damages and a third part of the produce. Law 4, title 13, book 6, Collection of Castile, Rockwell, 126. By a second ordinance of Philip, all persons, natives and foreigners, were permitted to search for mines. It was declared that the finders of them should have a right of possession and property to them, with a right to dispose of them as of any thing of their own, provided they complied with the rules of the ordinance, and paid to the crown the seignorage required. These privileges were afterwards extended to the Indians by name, as may be seen by law 1, title 19, book 4, Collection of the Indies. Rockwell, 128–387. Such were

the regulations of Spain in respect to the rights of the Indians in lands and mines before Louisiana became a part of her dominions, from the cession of it by France in 1763.

What were the regulations of France in respect to mines in her colonies, we need not inquire into, as the transaction we have before us happened after France had parted with the province, and after Spain had legislated new ordinances upon the subject of mines, which were applicable to all of her dominions, as well those in North as in South America. We mean the ordinances entered in the General Land Office of the Indies, at Madrid, the 25th of May, 1783. In chapter 5 of these ordinances, the king declares that mines are the property of his royal crown; that without separating them from his royal patrimony, he grants them to his subjects in property and possession, in such manner that they may sell, exchange, pass by will, either in the way of inheritance or legacy, or in any other manner to dispose of all their property in them, upon the terms they themselves possess them, to persons legally capable of acquiring. The grant depended upon two conditions: that the proportions of metal reserved were paid into the royal treasury, and that the mines were worked subject to the ordinances. To all the subjects of the king's dominions, "both in Spain and the Indies, of whatever condition or rank they may be," were granted the mines of every species of metals, but foreigners were not permitted to acquire or work mines as their own property, unless they were naturalized, or did so expressly under a license. The right of the Indians to work the mines, upon their own account, was at one time questioned. It was determined that they could do so. Law 14, title 19, book 4, Collection of the Indies, Rock. 137. And the mines discovered by Indians were declared to be, in respect to boundaries, on the same footing, without any distinction, as those worked or discovered by Spaniards. Besides the other privileges secured by this ordinance to the owners of mines upon the public lands, they had the right to use the woods on mountains in the neighborhood of them, to get timber for their machines, and wood and charcoal for the reduction of the ores. Rockwell, 82, § 12, c. 13. Besides the privileges just stated, they were exempted from a strict compliance with the ordinance in respect to the registry of their mines. Indeed, every indulgence was given to them. Much care was taken to preserve for them their property in mines, and to give them the means of working them. With these rights and privileges it is much more natural to construe the contract of the Foxes with Dubuque into a sale and a purchase of mines, than into a transfer of lands.

We will now consider Dubuque's petition to Governor Ca-

rondelet; the reference of it to Todd for information on the nature of the demand; Todd's reply, and the governor's final order. — Dubuque makes his purchase from the Indians the foundation of his prayer for a grant, and the inducement for the governor to give it. He asks the governor to accord to him the peaceable possession of the mines and lands, which is to say, from the hills above the little river Maquanquitois as far as the hills of Musquabinenque, which forms seven leagues on the western bank of the Mississippi, by three leagues in depth. We do not doubt that Dubuque meant to ask for lands as well as mines, and that his object was to get a grant for this large body of land. But the true point here is not what he meant to ask for, but what he had a right to ask for under his contract with the Indians, and what the governor meant to grant, and could grant under that contract. Mining was the motive which induced Dubuque to make his settlement among the Indians. It had been his pursuit and occupation for eight years before he petitioned the governor; the governor referred the petition to Andrew Todd for information on the nature of the demand. Todd replies, "I have to say that, as to the land for which he asks, nothing occurs to me why it should not be granted by your lordship, if you find it convenient, with the condition, nevertheless, that the *concessionario* shall observe the provisions of his majesty as to the trade with the Indians, and that this be absolutely prohibited to him, unless he have my consent in writing." The governor's order is granted as asked, or conceded as petitioned for, under the restrictions which the merchant, Mr. Andrew Todd, expresses in his report.

We have here, then, three things to note. First, land is described out of the contract of the Indians with Dubuque; next, that it is to be granted upon a condition; and third, that it is conceded as asked, under the restrictions expressed in the report of Todd. "Granted as asked," is the governor's order. It cannot be said that this is referable alone to the quantity of land asked for by Dubuque, and not to his statement that he had bought that quantity from the Indians, and that its boundaries were coincident with his description of them. There is no such description in the Indian sale to Dubuque. It is a misstatement of a fact. Admitting that the chiefs of the Fox Indians assented to the erection of monuments at the mouth of the Little Makoketa and at the mouth of the Tête des Morts, and that it was done to mark a boundary; when it is found that nothing was said by them or by Dubuque at that time descriptively of a tract of land which could be surveyed, the inference is that the monuments were marks within which and from which Dubuque was permitted to search for mines, and to

work them in the event that the mine of Peosta did not yield ore.

It cannot be presumed that the governor had not read the petition before he gave his order upon Todd's information; or that when giving, it was not his intention to confer upon Dubuque the benefit of his purchase from the Indians. He referred the petition to Todd for information. It was a reference out of the usual course of proceeding when applications were made for grants of land. Todd had neither agency nor office, or knowledge in such matters. The officials of the land office were not called upon. In every other grant made by the Baron Carondelet, the applications for them were so referred. Notwithstanding the very large grants which were made by him, under all the circumstances of each case, whether pressing or otherwise, gratuitous or for a consideration, he scrupulously adhered to all the forms and the essentials which custom, usage, and the law had imposed upon the granting of lands. The cause for his reference of Dubuque's petition to Todd is obvious. We find it in the petition in this suit. Dubuque had undertaken to interfere with others who attempted to trade with the Indians. It is said that he had not permitted any one to carry on that trade on the land from the time he had made his purchase from the Indians, and that he had driven from it forcibly a person who had, without his consent, landed goods upon it with an intention to sell them to the Indians. This, it appears from Todd's report, he had no right to do. The Indian trade was regulated by ordinances from the king. Todd had obtained the privilege to carry it on, and to exclude others from doing so without his consent. From his report it may be inferred that Dubuque had done so, its language being " that this (trade) be absolutely prohibited to him, unless he shall have my consent in writing." The governor recognizes Todd's right to give that consent. His order is, granted as asked, under the restrictions expressed in the information given by the merchant, Andrew Todd. This is a very novel condition to be annexed to a grant of land in full proprietorship, if the governor meant to give such a grant. Does it not rather imply that the governor meant to permit him to continue in the quiet enjoyment of the mines, and to work them, with the use of the lands, as the Indians had permitted him to do for eight years, notwithstanding what had been Dubuque's irregular interference and appropriation of the trade with the Indians. With such a condition it was revocable by the governor upon any imputation that he had violated it. It would not have been right to recall the order without proof of the transgression of it; but if that could be a subject of inquiry at all, it shows that though Dubuque asked for lands and

20 *

mines, that the governor had not made an unconditional grant of lands.

It is scarcely possible that such a reference of Dubuque's petition would have been made; that the subject of Indian trade should have been introduced into the affair by Todd; and that the governor should have recognized it as a cause for qualifying the terms in which grants of land were made; and that every official agency in making grants of land should have been disregarded, if it had been the intention of the governor to make to Dubuque a grant of the land as property, without any reference to his declaration that he had bought it from the Indians, and to the fact stated in the petition, that he was then working the mines "three leagues apart from each other."

The law for granting lands was, that the grants were to be made with formality, in the name of the king, by the governor-general of the province; that when the order to grant was given, that a surveyor should be appointed to fix the boundaries, and that the order itself should be registered in the land office, with the memorials and other papers, whatsoever they might be, which had induced the governor to make the grant. The practice of the governors, including the Baron de Carondelet, corresponded with all of the requirements just mentioned. Nothing of the kind was done in this case. The whole proceeding was kept from the proper office in New Orleans, where, by law and usage, an entry of it should have been made. Dubuque did not ask for a survey; he took with him the papers. The first notice given of the existence of them came from Dubuque himself, after the transfer of Louisiana to the United States, when the richness of the lead mines on the upper part of the Mississippi had attracted the attention of the public and of Congress. Rumors had reached the government at Washington that Dubuque claimed the richest of them, and that speculators were trying to get from him an interest in them. At that time it became necessary to explore the upper Mississippi and its sources, with the view of obtaining general information for military and legislative purposes, and more definite knowledge of what were the boundaries of Louisiana. Lieutenant, afterwards our distinguished General Pike, was detailed, with a sufficient exploring force, for that purpose. Among other things he was charged, when he arrived at what were called the Dubuque mines, to make particular inquiries about them, and into Dubuque's claim. He had an interview with Dubuque at his residence, some six or seven miles from the mines, but did not make an inspection of them, as Dubuque could not furnish him with transportation to their locality, and he then had been attacked with fever. He proposed however, to Dubuque, seve-

ral questions in writing, and we have the paper, with the answers, signed by both of them. They are curious and reserved upon the part of Dubuque, and may find a place here without interfering with the part of the argument which we are now upon: " What is the date of your grant of the mines from the savages? Answer. The copy of the grant is in Mr. Soulard's office at St. Louis. What is the date of the confirmation by the Spaniards? The same answer as to query first. What is the extent of your grant? The copy of the grant is at Mr. Soulard's office at St. Louis. What is the extent of the mines? Twenty-eight or twenty-seven leagues long, and from one to three broad. Lead made per annum? From 20 to 40,000 pounds. The answers to the other questions are equally indefinite, and all were so excepting as to the place where the grant could be found." 1 Appendix to Pike's Expedition, 5. These answers, however, were communicated to Mr. Gallatin before the commissioners for adjusting land claims had made their report, and they serve to show that when he made his report to the President upon the Dubuque claim, that he had done so with his usual care and caution. Whatever was then in Mr. Soulard's office at St. Louis, connected with it, he had obtained. His report is not liable to the censure which was cast upon it in the argument; for if it be defective in clerical particulars, his conclusion is sustained both by knowledge and principle.

We return to the point which we left to give the extract from Pike. It was, that there were not upon Dubuque's petition any of the customary forms, or required proceedings, which had always been observed by the Spanish governors in making grants of lands. They were not only omitted by the governor, but were not asked for by Dubuque; or if he did ask, there was not a compliance with the request. The papers were kept by him without any action upon them until after the United States had acquired Louisiana.

This conduct varies so much from the ordinary action of persons under like circumstances, that it may very properly be mentioned with the other incidents of this case, which have led us to the conclusion that the governor's order was not meant to concede to him more than the quiet enjoyment and peaceable possession of the mines, and such lands as the mining ordinances permitted to be used for working them. The objection with us is not that Dubuque had not caused a survey to be made, but that he had not obtained, that the governor had not given, an order for such purpose. We think it could not have been done by Soulard or any other official Spanish surveyor. No one of them would have ventured to stretch a chain upon the land with a view of separating it from the

public domain, without special authority to do so from the
governor. Such an order was the uniform accompaniment of
a grant, and without it a concession was incomplete : though,
when given, if circumstances such as were mentioned in the
argument of this case interfered with its execution, it did not
lessen the completeness of the title, if the description of the
land was such that it could be carried into a survey. There
ought not to have been in this case, any apprehension of Indian
interference with a survey, after Dubuque's residence of more
than eight years among them, if their understanding had been
for all of that time that they had sold to him the land. His
relations with them are represented to have been friendly and
influential in their more important concerns; and if, as is stated,
he kept all intruders from the land in its whole extent, claiming
it as his property, and not permitting any one to come upon it
to trade with the Indians, and keeping that trade for himself —
all of this with the acquiescence of the Indians — it is not pro-
bable that fears of their opposition to it prevented him from
getting an order of survey, or from having run from the monu-
ments the three lines which would have comprehended his
description of the land. It is certain that he had no order for
a survey. It is equally certain, as it had not been given by
Governor Carondelet, that he could not have obtained it from
his successor, Gayoso de Lemos. It will not do in such cases
to indulge conjecturally, as to the motives of Dubuque for such
conduct, but sometimes historical facts clear up difficulties
which cannot be explained in any other way. Governor Ca-
rondelet's commission had been recalled, and his successor,
Gayoso, appointed, before the former had given his order upon
Dubuque's petition. He was then only holding over until the
arrival of his successor from Natchez. Gayoso lost no time;
perhaps urged to it by very recent larger grants which his pre-
decessor had made, and which were complained of, in announc-
ing that in respect to the quantity to be granted, he would
enforce the regulations of O'Reilly, not only in Opelousas,
Attacapa, and Nachitoches, but throughout the province. From
that moment, Dubuque's claim was, at all events, if he had any
rightful claim for land from his Indian contract, reduced to a
league square, unless it could be shown that it had been already
confirmed by Governor Carondelet; and this course was pre-
ferred in the assertion of title to it before the tribunals of the
United States.

In our construction of the muniments of title of this case, we
have considered them, as he does, as one instrument, and so
they were treated in the argument — that each might aid to
explain the other, and that the truth might be obtained from

Chouteau v. Molony.

the whole of them in regard to this transaction. Our conclusion is, Dubuque's contract with the Fox Indians was a sale to him of the Peosta mine, with its allowed mining appendages, with the privilege to search for other mines in the event that ore was not found in that mine; and that the order of Governor Carondelet, upon his petition, was not meant to secure to him the ownership of the lands described in his petition.

The real importance of this case, the interests involved, and the notoriety which has been given to the Dubuque claim for more than forty years, in Congress and out of it, do not permit us to stop this opinion with the conclusion just announced. Hitherto the case has been considered in connection with the documents upon which the plaintiff relies, and as if Governor Carondelet had official authority to make a grant of the land upon the petition of Dubuque. We will now present another view of it. Dubuque prays for a concession of what was then Indian land, which had been in the occupancy of the Indians during the whole time of the dominion of Spain in Louisiana, and which was not yielded by them until it was bought from them by treaties with the United States. It is a fact in the case, that the Indian title to the country had not been extinguished by Spain, and that Spain had not the right of occupancy. The Indians had the right to continue it as long as they pleased, or to sell out parts of it — the sale being made conformably to the laws of Spain, and being afterwards confirmed by the king or his representative, the Governor of Louisiana. Without such conformity and confirmation no one could, lawfully, take possession of lands under an Indian sale. We know it was frequently done, but always with the expectation that the sale would be confirmed, and that until it was, the purchaser would have the benefit of the forbearance of the government. We are now speaking of Indian lands, such as these were, and not of those portions of land which were assigned to the Christian Indians for villages and residences, where the Indian occupancy had been abandoned by them, or where it had been yielded to the king by treaty. Such sales did not need ratification by the governor, if they were passed before the proper Spanish officer, and put upon record.

The Indians within the Spanish dominions, whether christainized or not, were considered in a state of tutelage. In the Recopilacion de las Leges de las Indias, a part of the official oath of the Spanish governors was, that they would look to the welfare, augmentation, and preservation of the Indians. Book 5, c. 2. Again: Indians, although of age, continue to enjoy the rights of minors, to avoid contracts or other sales of their property — particularly real — made without authority of the judi-

ciary or the intervention of their legal protectors. Solerzanos Politicà Indiana, I, 209, §§ 24, 42. Indians are considered as persons under legal disability, and their protectors stand in the light of guardians. 46, 51. The fiscal in the audiencia were their protectors, but in some cases they had special protectors. When Indians dispose of their landed property or other thing of value, the sale is void unless made by the intervention of the authorities, or of the protector-general, or person designated for the purpose. C. 29, 42. Many other citations of a like kind might be given from the king's ordinances for the protection of the Indians. They were protected very much by similar laws when Louisiana was a French province, excepting in this: that the power to confirm an Indian sale of land, as to the whole or a part of it, or to reject it altogether, was exercised by the French governors of the province.

Nor were these laws of protection disregarded. They were brought into operation very soon after General O'Reilly took possession of the province, in 1769. He acted not only upon Indian sales of land made after the cession of the province by France, but upon such as had been made before. Considering himself as representing the king, when called upon to relinquish the title of the crown in favor of such purchasers, he rejected them altogether when not made in compliance with the laws for the protection of the Indians, and diminished the quantities of such sales when the purchasers could show from any cause whatever that they had an equitable claim upon the Indians for remuneration. The first sale of the kind to which his attention was called was one from Rimeno, the chief of the Attacapas village, as early as 1760, to Fuselien de la Clare, afterwards claimed by Morgan & Clark. O'Reilly did not think that the sale had been completed so as to pass the title to it under the French law, though it had been executed before the governor. De la Clare then petitioned for a grant of one league to front upon the Teche, by a league in depth, making the sale to him from the Indians, of two leagues in front, from north to south, limited on the west by the River Vermilion, and on the east by the River Teche, the foundation of the equity of his claim for a grant. Governor O'Reilly received the application and granted a league in front by a league in depth. In the same manner all other larger purchases from the Indians were afterwards reduced to one league square. It became the common understanding that no larger confirmation of an Indian sale of land would be made, and no one of them was ever confirmed for more, by either of the Spanish governors of Louisiana, including Salcedo, the last of them. This of Dubuque is the only case in which it is claimed to have been done. In Florida, larger Indian sales

of land were confirmed, upon the ground that the governors of that province acted in such a matter upon a different authority from the king. But both in Florida and Louisiana it was so well understood that an Indian sale of land, before it could take effect at all, needed the ratification of the governor, that it was frequently inserted in the act of sale. See claims of purchasers of Indian lands by Stephen Lynch, Joseph and John Lyon. Such had been the law of Louisiana, or rather the administration of it by the governors, for more than eighteen years, when Dubuque alleges that he bought the land from the Fox Indians. Such it had been for twenty-six years when he presented his petition to the Baron Carondelet. It is true that the governors had the same powers to grant the public lands of the crown, to which a title and instant possession could be given to the grantee; but it is also true, in their action upon the sales of Indian lands still in their occupancy, that they were bound by the same laws, usages, and customs, and by those laws especially which had been made for the protection of the Indians, and by the oath which they took to look to the welfare, augmentation, and preservation of the Indians.

Such are our views of the law relating to the powers of the governor in respect to sales of land by the Indians. If we thought then, as we do not, that the order of Governor Carondelet upon the petition of Dubuque was a grant of the ownership of the land, we should be obliged to decide that it was an unaccountable and capricious exercise of official power, contrary to the uniform usage of his predecessors in respect to the sales of Indian lands, and that it could give no property to the grantee. It is not meant, by what has just been said, that the Spanish governors, could not relinquish the interest or title of the Crown in Indian lands and for more than a mile square; but when that was done, the grants were made subject to the rights of Indian occupancy. They did not take effect until that occupancy had ceased, and whilst it continued it was not in the power of the Spanish governor to authorize any one to interfere with it.

It has been intimated that the action of the governors of Louisiana upon the sales of Indian lands, especially in the reduction of them to a league square, was the consequence of O'Reilly's regulation, limiting grants of land in particular districts to a league square. This may have been so as regards quantity, but the principle upon which they acted upon Indian sales of land is to be found in those laws of Spain which made them officially the protectors of the Indians.

But it will be said at this point of the case, as it was said in the argument, if the governor's order was not a grant for lands, that

it gives to Dubuque nothing, as he had already the occupancy under the Indian purchase. The error in the statement is, the assertion that he had the right to occupancy, and in the supposition that the opposers of the grant contend that the governor meant to give him that right. Not so. The last, we have just said, the governor could not give, and that the Indian sale could not give it to a purchaser until the sale had been ratified. But the privilege to work the mines in lands still in the occupancy of the Indians, he could give, because the mines were a part of the royal patrimony of the crown, and the king had directed that they might be searched for and worked in all of his dominions by his subjects, both Spaniards and Indians. When, then, Dubuque represented to him that he had bought mines and lands from the Fox Indians, and asked for the enjoyment and peaceable possession of them, and the governor wrote " granted as asked for," he meant no more than this : as you say that you have bought the mines, with the permission of the Indians to work them, you shall also have mine.

The view taken of this case relieves us from the consideration of several points which were made in the argument of it ; particularly from that of the effect of the words " peaceable pospossession," found in the petition of Dubuque to Governor Carondelet, to which it was contended his final order had a direct reference. We admit, with pleasure, that it was shown by a learned and discriminating appreciation of those words in grants for land, that they were more frequently than otherwise a grant of ownership ; but they cannot do so in a case where the order or grant is given with direct reference to a fact in the petition for it which does not exist, or where a grant is given upon an Indian sale of land contrary to what we think the laws of Spain permitted to be done. The order given upon the petition of Dubuque, had it been intended to be a grant of ownership, would not have been binding upon the conscience of the king of Spain, and only such as are so are conclusive against the United States under the treaty transferring Louisiana.

Nor is it necessary for us to notice the reference which was made in the argument to the treaty made by General Harrison with the Fox Indians, further than to state that it is no more than a declaration that the Indians, in selling to the United States their land, did not mean to sell parts of it which they had sold before to others. It may have had a reference to this claim of Dubuque, but not having been so expressed, it cannot be inferred.

We cannot leave this case without a reflection occurring from our investigation of it, and which is not favorable to the statement made by Dubuque that he had bought the land from the Fox Indians.

Dubuque's mines, as they were called, are on the west bank of the Mississippi, a little more or less than seventy miles below Prairie du Chien, where he made his contract with the Indians. They are so near to the city of Dubuque that they may be said to be contiguous. In the year 1780 the wife of Peosta, a warrior of the Kettle chief's village, discovered a lead mine on these lands, and other mines were found soon afterwards. The principal mines are situated upon a tract of one league square, immediately at the Fox village of the Kettle chief, extending westward. This was the seat of the mining operations of Dubuque. The Kettle chief's village was on the bank of the Mississippi River, below the little river Makoketa, and was at the time when Dubuque settled there, a village of many lodges. Schoolcraft.

If it was not the largest of the Fox or Outagami Indians, it was not inferior to any other village than that of the Foxes and Sacs on the bank of the Mississippi River, near Rock Island. It had been for a long time an Indian village when Dubuque settled there. It continued as such all the time that Dubuque resided there until his death; that is, from 1788 to 1810; and its chief survived Dubuque for ten years. Can it be presumed that, under the contract with Dubuque, the Indians meant to sell him that village, and all the lands for miles above and below it, with all of the mines upon the land directly adjoining it? And yet such must be the result if that were so; for, carry Dubuque's description of his purchase into a survey, and it takes in the Kettle chief's village. We cannot believe that the Indians did make such a sale, or that they were so ignorant of their topography as not to know that a line extended from the monuments on the Makoketa and the Tete des Morts for three leagues west, with a base equal to the Mississippi boundary, would not have included their village. We make no other commentary than this — that time, if it does not obliterate the offences and weaknesses of men, disposes us to recollect them in connection with their merits; and if we speak of them at all, to do so forbearingly.

We will now close the case with an additional remark. This claim was presented to Congress in the year 1812. It had been before the commissioners for adjusting land claims in the Territory of Louisiana, as early as 1806. It has been repeatedly before both houses of Congress, but with such differing opinions concerning it, that no confirmation of it could be obtained, although the commissioners had returned it as a valid claim. It was before the Senate again in 1845. It was then reported upon, and again in 1846. Doc. March 30, 1846. That is an able paper; but b sides conclusions drawn from the decisions

of this court which we do not think applicable, and others which were made without reference to the laws of Spain, which prevailed in Louisiana, we think it remarkable that the report, though containing frequent allusions to Dubuque's contract with the Indians, and extracts from it, does not set it out entire as one of the papers upon which the claim was rested. The petition of Dubuque to the governor, his reference of it to Todd, Todd's reply, and the governor's order, are the papers upon which the report was made. The same documents were placed before the commissioners in 1806, without the Indian contract. See Public Lands, American State Papers, vol. 3, p. 580. It does not surprise us that a correct view was not taken of it then, or that the committee of public land claims in the Senate should have viewed it differently in 1846 from that now taken by this court. The petitioner in this suit has the merit of having put his case upon every thing in any way connected with the claim of Dubuque fairly, fully, and openly. Still if success does not follow his expectation, he cannot complain of it, for the purchase from Dubuque was an adventure to buy the half of the land, with a full knowledge of all of the papers and the circumstances under which Dubuque claimed.

The judgment of the District Court is affirmed.

*Order.*

This cause came on to be heard on the transcript of the record, from the District Court of the United States for the District of Iowa, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said District Court in this cause be, and the same is hereby affirmed, with costs.